**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KELLY BROWN, ROBERT BROWN,** | ) | |
| **and SHANA CLAUD-WEST,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:16-cv-02737** |
| | ) | **Chief Judge Crenshaw** |
| **THE METROPOLITAN** | ) | |
| **GOVERNMENT OF NASHVILLE AND** | ) | |
| **DAVIDSON, COUNTY, TENNESSEE;** | ) | |
| **and FRED CARR,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending are a Motion to Dismiss (Doc. No. 8) filed by The Metropolitan Government of

Nashville and Davidson County, Tennessee ("Metro") and a Motion to Dismiss (Doc. No. 23) filed

by Fred Carr ("Carr"). Both Motions have been fully briefed by the parties. (Doc. Nos. 9, 15, 17,

23, 27 and 30). For the reasons that follow, Metro's Motion will be granted, and Carr's Motion will

be granted in part and denied in part.

### I. Factual Background

Based on the Complaint, the relevant factual allegations (in roughly chronological order) are

as follows:

Kelly Brown ("Ms. Brown"), Robert Brown ("Mr. Brown"), and Shana Claud-West ("Ms.

Claud-West") are all long-term employees of the Metropolitan Nashville Public Schools ("MNPS").

During the relevant period, Ms. Brown was a counselor at Pearl-Cohn High School while Ms.

Claud-West was a counselor at Hunter's Lane High School. (Doc. No. 1, Complaint ¶ 22, 34). Mr.

1

Brown has been a schoolteacher in middle Tennessee for more than thirty years. (Id. ¶ 23).

In April 2014, Ms. Brown and three other counselors were instructed by Sonia Stewart, the principal at Pearl-Cohn, to remove certain students from End of Course ("EOC") classes and place them into an "A+ Credit Recovery Program" ("A+ Program") or another elective course. (Id. ¶ 24). This was done so that the affected students (some of whom were passing their classes) would not sit for the year end tests required by Tennessee law. It was also done without notice to the children's parents and in violation of MNPS policies. (Id. ¶ 25).

On May 21, 2014, Ms. Brown met with Principal Stewart to discuss the removal of students from EOC classes, among other things. Principal Stewart said that she was instructed by her superior to remove the students. (Id. ¶ 30). On May 29, 2014, Mr. Brown reported what was taking place at Pearl-Cohn to his own principal, Steve Chauncy who, in turn, reported it up his chain of command. (Id. ¶ 31).[1]

While serving as an academic advisor at Hunter's Lane High School, Ms. Claud-West, too, claims to have witnessed the improper removal of students from instructional courses. Specifically, in July 2013, she discovered that numerous schedules at the school had been changed and that students had been removed from EOC courses and placed in the A+ Program. (Id. ¶¶ 34, 35). Then, on February 17, 2014, Assistant Principal ("A.P.") April Snodgrass removed other "students from EOC courses in order to prevent their scores from negatively impacting the school's test score statistics." (Id. ¶ 36). When asked the next day via email from Ms. Claud-West why that was done, Snodgrass refused to answer. (Id. ¶ 37). Three weeks later, Ms. Claud-West was accused of being

---

[1] It is unclear from the Complaint where Mr. Brown was teaching, but it appears that he was not a teacher at Pearl-Cohn at this time.

incompetent and insubordinate, and was placed on an "Intervention Plan" by Principal Kessler.[2] (Id. ¶ 38).

On June 16, 2014, Ms. Claud-West sent a letter to Principal Kessler, Scott Lindsay of MNPS Employee Relations, and Dr. Ott, the Director of Human Resources for MNPS, informing them about students being pulled from EOC courses at Hunter's Lane so that test scores would be artificially inflated. Ms. Claud-West also claims that she provided Dr. Jesse Register, who at the time was the Director of Schools, with evidence demonstrating that students were being improperly removed from EOC courses. (Id. ¶¶ 42. 44).

On July 14, 2014, Ms. Brown and Ms. Claud-West filed a complaint with the United States Department of Education regarding MNPS' testing practices and the removal of students from EOC courses. (Id. ¶ 45). A few months later, on October 14, 2014, Ms. Brown emailed Representative Rick Womick, who is a legislative member of the Tennessee General Assembly's Joint Education Committee, outlining MNPS's alleged wrongdoing and requesting his assistance. This was followed a few weeks later by the submission of evidence gathered by both Ms. Brown and Ms. Claud-West that contained redacted information regarding individual students. Rep. Womick, in turn, contacted the Tennessee Department of Education and requested that they investigate the allegations. (Id. ¶¶ 48, 49).

Between February and April 2015, Plaintiffs and Rep. Womick met with numerous individuals from various state agencies, including the Tennessee Comptroller, the Department of Education, and various investigators. Despite their efforts, no official investigation into the testing practices was conducted. (Id. ¶ 51).

---

[2] The first names of some of the actors are not provided in the Complaint.

Thereafter, Plaintiffs were interviewed by Phil Williams, an Investigative Reporter for WTVF News Channel 5 in Nashville, Tennessee. They provided Mr. Williams with several redacted student records supporting their allegations against MNPS. (Id. ¶ 51).

On November 2, 2015, News Channel 5 aired a report about the manipulation of school statistics through the pre-test removal (without notice to the parents) of lower performing students from EOC courses. The following day, it aired an interview with a testing expert, Bob Schaeffer of the National Center for Fair and Open Testing, who referred to MNPS' practices as "gamesmanship" designed to manipulate test scores so that the district's educational policies appeared more favorable. (Id. ¶ 55). Additional news agencies, including THE TENNESSEEAN also covered the testing scandal. (Id. ¶ 56).

On November 12, 2015, Rep. Womick issued a notice that the House Education Committee would hear testimony regarding the "alleged manipulation of End of Course Examinations, school performance scores, and district performance scores by [MNPS]." The notice also provided that "[a]ll individuals who have information regarding the removal of students from these courses prior to end of course examinations by MNPS and who are willing to offer testimony to or testify. . . will be afforded the full protection and immunity afforded to them under TCA 8-50-116, known as the 'Tennessee Whistle Blower Law.'" (Id. ¶ 58).

On December 10, 2015, Plaintiffs testified before the Committee and provided student records at the Committee's request. (Id. ¶ 59). After testifying, however, they discovered that a few documents had not been properly redacted. Upon requesting return of the binders containing the documents, however, Plaintiffs were informed by Rep. Womick that the documents, whether redacted or unredacted, had been provided only to those authorized by law to view the material. (Id.

¶¶ 60, 61).  Rep. Womick then informed MNPS that he and Rep. Brooks had received unredacted copies in a sealed envelope and they had been forwarded to Committee members and individuals in the Tennessee Department of Education.  (Id. ¶ 62).

On December 30, 2015, MNPS Chief Operating Officer Fred Carr sent letters to Plaintiffs requesting a meeting to discuss their "apparent violation of the Family Education Rights and Privacy Act (FERPA)," with the stated reason for this meeting being to gather information regarding the access and release of "protected student data."  (Id. ¶ 63).  On January 5, 2016, Plaintiffs' counsel sent Carr a letter stating that, not only did Plaintiffs have a First Amendment right to speak on matters of public concern, Rep. Womick had assured them that they would not be retaliated against in any way.  (Id. ¶ 67).  The next day, Plaintiffs met with Carr and other MNPS officials, at which time Carr informed Plaintiffs they would be reprimanded.  He also threatened their termination.  (Id. ¶ 68).

On January 8, 2016, Rep. Womick sent a letter to MNPS in which he stated that the evidence provided to the Committee was protected by the Whistle Blower statute, and that House of Representative lawyers reviewed the material to make sure it complied with "all privacy laws, in particular" FERPA.   The letter also stated that unauthorized individuals did not have access to the documents.  (Id. ¶ 69).

On January 15, 2016, Carr issued Plaintiffs written reprimands for violating FERPA, and those reprimands were placed in their permanent personnel files.  (Id. ¶ 70).  Carr also sent a letter to the United States Department of Education's Family Policy Compliance Office to report what he characterized as "an intentional data breach," claiming that a "television news report was released which showed a brief view of a student's transcript with the name visible."  (Id. ¶ 71).

Based upon the foregoing, Plaintiffs filed a two-count Complaint. Count I, brought pursuant to 42 U.S.C. § 1983, alleges Plaintiffs' "First Amendment rights to speak out on matters of public concern were violated." (Id. ¶ 73). Count II, brought under state law, alleges a violation of the Education Truth in Reporting and Employee Protection Act ("ETREPA"), Tenn. Code Ann. § 49-50-1401.

## II. Standard of Review

Rule 12(b)(6) governs dismissal for failure to state a claim upon which relief can be granted and requires the Court to take all the factual allegations in the complaint as true. Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Id. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id.

## III. Application of Law

Both Defendants have filed Motions to Dismiss. The Court considers Carr's motion first because "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." Watkins v. City of Battle Creek, 273 F.3d 682, 685-86 (6th Cir. 2001); see City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

**A. Carr's Motion to Dismiss**

Carr's request for dismissal is two-fold. He argues that both of Plaintiffs' claims fail on the merits and, that, even if they state a claim, he is entitled to qualified immunity.

*1. Count I – First Amendment Retaliation*

"First Amendment retaliation claims are analyzed under a burden-shifting framework." Dixon v. Univ. of Toledo, 702 F.3d 269, 274 (6th Cir. 2012). "In order to state a claim for First Amendment retaliation, a plaintiff must establish that: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two 'that is, the adverse action was motivated at least in part by his protected conduct.'" Gillis v. Miller, 845 F.3d 677, 683 (6th Cir. 2017) (quoting Dye v. Office of the Racing Comm'n, 702 F.3d 286, 294 (6th Cir. 2012)). "If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate 'by a preponderance of the evidence' that the employment decision would have been the same absent the protected conduct." Dye, 702 F.3d at 295 (quoting Eckerman v. Tenn. Dep't of Safety, 636 F.3d 202, 208 (6th Cir.2010).

Carr argues that "Plaintiffs' First Amendment claim fails . . . under the balancing test established" in Pickering v. Board of Education, 391 U.S. 563 (1968) (Doc. No. 24 at 1). That could turn out to be the case, but the Court cannot make that determination based upon the present record.

In Pickering, the Supreme Court held that the First Amendment provides protection to public employees to exercise the right of free speech without risk of retaliation by their employer if the speech in question is "on matters of public interest." Pickering, 391 U.S. at 568. That protection, however, is not absolute because "the State has interests as an employer in regulating the speech of

7

its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id. Therefore, "[t]he Pickering balancing test is used 'to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer.'" Gillis, 845 F.3d at 684 (quoting Scarbrough v. Morgan Cnty. Bd. of Educ., 470 F.3d 250, 255 (6th Cir.2006)). "Considerations involved in this balancing test include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" Dye, 702 F.3d at 295 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

Although "Pickering balancing is 'a matter of law for the court to decide,'" Delvin v. Kalm, 630 Fed. App'x 534, 537 (6th Cir. 2015) (quoting Farhat v. Jopke, 370 F.3d 580, 593 (6th Cir.2004)), it is not something that can be decided in a vacuum. To the contrary, "[i]n many cases, due to inadequate factual development, the prong two balancing test cannot be performed on a 12(b)(6) motion." Weisbuch v. County of Los Angeles, 119 F.3d 778, 783 (9th Cir.1997). So it is here.

Carr contends that "Plaintiffs' claim fails because their interest in speaking out against what they believed to be 'unethical and illegal testing practices'—more specifically, by speaking with news media and legislators and producing, at least in one instance, unredacted student records—does not outweigh MNPS's (and, by extension, Mr. Carr's) interest in preventing release of identifying student information in violation" of FERPA. (Doc. No. 24 at 7). He also argues that the Sixth Circuit, in Bonnell v. Lorenzo, 241 F.3d 800, 821-824 (6th Cir. 2001), and other courts have recognized the government's interest in protecting confidential student records, see e.g., McAvey

8

v. Orange-Ulster BOCES, 805 F. Supp.2d 30, 41-42 (S.D.N.Y. 2011) (stating that FERPA protected a student's "confidentiality rights in his educational records"); Gelfand v. Cherry Creek Sch. Dist., 2009 WL 87578959, at *11 (D. Colo. June 10, 2009) (recognizing school district's interest in protecting the confidentiality of student records).

Although there is little doubt that educators have an interest in shielding confidential student records, particularly when the same is required by statute, Carr's placement of FERPA on one side of the balancing scale is premature. It is premised on something which has yet to be established. He claims he took action against Plaintiffs because they improperly disclosed records, but it is not clear that they did so and, more importantly, it is unclear whether Carr took the action he did because of that alleged disclosure. Improper disclosure may have been the reason for the reprimand, but it could also be that Carr decided to punish Plaintiffs because they discovered a potential problem and then had the audacity to air that publicly. This is underscored by Plaintiffs' contention that "[t]here has never been a charge of FERPA violation from the United States," "[n]o parent ever complained about the Plaintiffs' conduct," and "[t]he only accusation of FEPRA violations came from the Defendant Fred Carr following the Plaintiffs' disclosure to the media and to the House Education Committee." (Doc. No. 27 at 6).

"[I]t is never objectively reasonable to act with a retaliatory intent, regardless of which direction Pickering balancing tips." Richardson v. Pratcher, 48 F. Supp. 3d 651, 669 (S.D.N.Y. 2014); see Waters v. Churchill, 511 U.S. 661, 681 (1994) (denying summary judgment where defendants "would have been justified in firing [plaintiff] for [certain] statements" but there remained a question as to defendants' "actual motivation"); Gorman–Bakos v. Cornell Coop. Extension, 252 F.3d 545, 557 (2d Cir.2001) (denying summary judgment where employer could

9

have terminated plaintiffs on account of disruptiveness of speech but there was a material issue as to whether, "even if such disruption occurred, plaintiffs were in fact not dismissed because of the disruption, but because of the content of their speech"). In fact, "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable even if the action would have been proper if taken for a different reason." Hoover v. Radabaugh, 307 F.3d 460, 467 (6th Cir. 2002) (citing Bloch v. Ribar, 156 F.3d 673, 681 (6th Cir. 1998)). Thus, Carr is not entitled to dismissal on the grounds that Plaintiffs' First Amendment claim fails to state a claim.

For much the same reason, Carr's request for dismissal pursuant to the qualified immunity doctrine fails. Under that doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "'In inquiring whether a constitutional right is clearly established,'" a court "'must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" Brown v. Battle Creek Police Dep't, 844 F.3d 556, 566-67 (6th Cir. 2016) (quoting Walton v. City of Southfield, 995 F.2d 1331, 1336 (6th Cir. 1993)). Furthermore, "to be 'clearly established,' a right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim." Id. (quoting Viilo v. Eyre, 547 F.3d 707, 710 (7th Cir. 2008).

Carr does not claim that Plaintiffs did not have a clearly established right to speak out about matters of public concern, or even that the subject about which they spoke–allegedly artificially inflated tests scores–was not a matter of concern to the public. He argues instead that Plaintiffs have

10

not "identif[ied] clearly-established law that would have put [him] on notice that disciplining employees for FERPA violations under the circumstances of this case constitutes a First Amendment violation." (Doc. No. 31 at 3-4). Again, that places in issue the central question of whether the stated reason was the real basis for the reprimands Plaintiffs received. As such, it is a matter that can only be addressed at a later date after discovery has been conducted.[3]

### 2. Count II – ETREPA Claim

As with Plaintiffs' First Amendment claim, Carr levels a two-prong attack, arguing that the ETREPA claim fails on the merits or, alternatively, he is entitled to qualified immunity.[4] In response, Plaintiffs contend ETREPA "was clearly established at the time the Defendant Carr reprimanded Plaintiffs," and that his "violations of clearly defined state law preclude any finding that he is entitled to qualified immunity on Plaintiffs' state law claim." (Doc. No. 27 at 8, 10). Because the statute is not as clear as Plaintiffs' claim, Carr is entitled to qualified immunity.

ETREPA was enacted by the Tennessee Legislature in 1989, with the stated purpose being to

---

[3] The Court recognizes that "[a]lthough courts eschew considering an [official's] subjective intent when applying the objective reasonableness test, . . . an [official's] explanation of his motivations inform a court's understanding about what an objectively reasonable [official] would have done under such circumstances." Jones v. City of Cincinnati, 736 F.3d 688, 695-96 (6th Cir. 2012) (internal citation omitted). In other words, "the court may not simply accept what may be a self-serving account by the [official]. It must look at the circumstantial evidence that, if believed, would tend to discredit the [official's] story." Jefferson v. Lewis, 594 F.3d 454, 462 (6th Cir. 2010).

[4] Although this claim is brought under state law, "Tennessee authority indicates that qualified or good faith immunity also applies to municipal officers who have been named as defendants in state causes of action." Harris v. Metro. Gov't of Nashville, 2007 WL 4481176, at *9 (M.D. Tenn. Dec. 18, 2007) (collecting cases); see Fowler v. Burns, 447 F. App'x 659, 663 (6th Cir. 2011) (stating that "Tennessee's discretionary function immunity parallels the federal qualified-immunity analysis"); Rogers v. Gooding, 84 Fed. Appx. 473, 477 (6th Cir.2003) (observing that "[t]here is . . . Tennessee authority which applies qualified or good faith immunity to state law claims"). Furthermore, Plaintiffs do not argue that qualified immunity is not an available defense to a claim brought under ETREPA.

11

discourage persons, whether employed, elected or appointed, who are required to furnish statistical data, reports or other information to local or state departments, agencies or legislative bodies, from knowingly and willfully making or causing to be made any false or inaccurate compilation of statistical data, reports or information related to the operation of an LEA [local education agency] as defined in § 49-1-103. It is the intent of the general assembly to reduce the waste and mismanagement of public education funds, to reduce abuses in governmental authority and to prevent illegal and unethical practices.

Tenn. Code Ann. § 49-10-1402(a).  The statute goes on to provide that

[t]o help achieve these objectives, the general assembly declares that public education employees should be encouraged to disclose information on actions of LEAs that are not in the public interest and that legislation is needed to ensure that any employee making those disclosures shall not be subject to disciplinary measures, discrimination or harassment by any public official.

Id. § (b).

Clearly, the foregoing is broad and remedial language that supports Plaintiffs' position.  So, too, does the definition of "disclosure of information" which

means the written provision of evidence to any person, the department of education, a legislator or individual employee of the department or general assembly, or testimony before any committee of the general assembly, regarding any action, policy, regulation, practice or procedure, including, but not limited to, the waste of public education funds, mismanagement, falsification of state required reports, inaccurate compilation of statistical data or reports or abuse of authority by locally employed, elected or appointed officials or employees of an LEA.

 Tenn. Code Ann. § 49-50-1403.

However, the foregoing language cannot be read in isolation.  Rather, "[t]he role of [a court] in statutory interpretation is to assign a statute the full effect of the legislative intent without restricting or expanding the intended scope of the statute." State v. Gibson, 506 S.W.3d 450, 455 (Tenn. 2016); see Metro. Gov't of Nashville v. The Bd. of Zoning Appeals of Nashville, 477 S.W.3d 750, 756 (Tenn. 2015) (same).   "To determine legislative intent, [a court] first look[s] to the plain language of the statute, giving the statute's words their natural and ordinary meaning."   Id.;

12

Waldschmidt v. Reassure Am. Life Ins. Co., 271 S.W.3d 173, 176 (Tenn. 2008) (same).

Here, the retaliation provision of ETREPA provides that "[a] person having knowledge of a knowing or willful falsification within the meaning of § 49-50-1404 or the waste or mismanagement of public education funds may report or disclose the falsification, waste or mismanagement to the department of education or committee of the general assembly or individual official, member or employee of the department or committee." Tenn. Code Ann. § 49-15-1408.[5] Section 1404, in turn, provides:

> No person or persons required by state law, or rules or regulations promulgated pursuant to those laws to collect, manage, review and maintain accurate records pertaining to the operation of an LEA shall knowingly and willfully make or cause to be made any false statement in any detail of statistical or financial data, reports or other information requested or required by a state official, employee, agency, department, board, commission or other body in the executive branch of state government, or any board, commission, committee, member or employee of the legislative branch of state government.

Id. § 49-50-1404. Finally, the statute provides that "[a]ny person reporting under this part shall have a civil cause of action against any person or employer who causes a disciplinary action or threat of a disciplinary action against the reporting person." Id. § 49-40-1409(a).

Even though the purpose of the statute is intended to be broad as evidenced by its prefatory language, the actual retaliation section can be read much more narrowly because it is linked to Section 1404 which prohibits knowingly making a false statement relating to "financial data, reports or other information requested or required by a state official." Plaintiffs do not allege that Carr made any such false statement, and they concede this point in their reply brief. (Doc. No. 27 at 11). They argue, instead, that there was an "inaccurate compilation of statistical data or reports" and that

---

[5] In addition to Section 1404, the statute references Section 1405. That section in inapplicable here because it relates to the making of false statements to law enforcement or the judiciary.

the "removal of students from required courses constitutes an 'abuse of authority' by local officials, as much as if students took the tests but their scores were not included in the report." (Doc. No. 15 at 14). Whether such action is covered by the statute is uncertain, but what is certain is that such coverage was not clearly established under the law at the time that Carr took action against Plaintiffs.

ETREPA has been the subject of few reported decisions. This is unfortunate for Plaintiffs for two interrelated reasons.

First, the lack of authority makes overcoming qualified immunity exceedingly difficult. <u>Getz v. Swoap</u>, 833 F.3d 646, 655 (6th Cir. 2016) (finding summary judgment appropriate based on qualified immunity given "the dearth of law putting an officer on notice" that what he did was unconstitutional). <u>See</u> <u>Jones v. Montgomery</u>, 2016 WL 5947347, at *6 (W.D. Tenn. Oct. 13, 2016) ("The dearth of case law dealing with a factual scenario analogous to the instant case compels a conclusion that Defendant's actions are covered by qualified immunity."). This is because "clearly established" means that "'[t]he contours of the right [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" <u>Wilson v. Layne</u>, 526 U.S. 603, 614-15 (1999) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987)). "[A]n action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." <u>Baynes v. Cleland</u>, 799 F.3d 600, 612 (6th Cir. 2015) (citing <u>Hope v. Pelzer</u>, 536 U.S. 730, 742-44 (2002)). Simply put, the Supreme Court has made clear that the *sine qua non* of the

"clearly established" inquiry is "fair warning." Id.

Second, none of the cases that have addressed ETREPA in any detail would have given Carr or anyone in his shoes "fair warning" that moving students into credit recovery programs instead of having them take EOCs constitutes knowingly or willingly providing false information to the state or the mismanagement of funds within the meaning of ETREPA. To the contrary, in Mosley v. Kelly, 65 F. Supp. 2d 725, 731 (E.D. Tenn. 1999) the court found the "reporting under the provisions of this part" language as set forth in Section 1409 to be "ambiguous." 65 F. Supp.2d at 730. The court also found that while "the phrases 'abuses in governmental authority' and 'prevent[ion] [of] illegal and unethical practices' would appear to be broad . . . when these phrases are viewed in light of the rest of the Act, it is clear the legislature had a narrower intent. Namely, the abuses of governmental authority and illegal and unethical practices the legislature is concerned about are activities prohibited by sections 49-50-1404 and 49-50-1405 of the Act." Id. at 731.[6]

Because neither Section 1404 (the only section applicable here) nor any cases clearly establish that moving students out of EOC classes to skew scores is covered by the statute, Carr is entitled to qualified immunity on Plaintiffs' ETREPA claim.

## B. Metro's Motion to Dismiss

The Complaint alleges that "Metro, and the Defendant Carr, having been duly warned, adopted and participated in a practice, policy, and custom in violation of the constitutional rights of

---

[6] The only other case that discusses ETREPA in any detail is inapposite and unhelpful to Plaintiff because the alleged misconduct clearly fell within the ambit of Section 1406. In Blair v. Rutherford Cty. Bd. of Educ., 2013 WL 3833516, at *1 (Tenn. Ct. App. July 19, 2013), the Tennessee Court of Appeals, Judge Richard Dinkins writing for the County, found that inaccurately reporting a teacher's Value-Added Assessment System score fell within the ambit of ETREPA and that the statute "does not require that Plaintiff prove that the allegations made in the report ultimately resulted in a finding of wrongdoing," id. at *4, in order for her to recover on her claim.

the Plaintiffs and are therefore liable." (Doc. No. 1, Complaint ¶ 76).  Based on <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978), Metro moves to dismiss, asserting that because the Complaint is premised on the "singular instance of Fred Carr issuing a written reprimand after Plaintiffs spoke to news reporter Phil Williams and testified at the House Committee Concerning removal of MNPS students from certain classes," (Doc. No. 9 at 4), this is insufficient to establish a policy or practice.  In response, Plaintiffs argue that "[r]emarkably, Metro ignores the landmark United States Supreme Court case in <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986)" which held "'it is plain that municipal liability may be imposed for a singe decision by municipal policymakers under appropriate circumstances.'" (Doc. No. 15 at 10, 11) (quoting <u>Pembaur</u>, 475 U.S. at 480).

The problem with Plaintiffs' position is that <u>Pembaur</u> also holds that "[m]unicipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered," <u>Pembaur</u>, 475 U.S. at 481, yet the Complaint contains no such allegations in relation to Carr's authority.  The unadorned allegation that Carr was the Chief Operating for MNPS is not enough.

Where, as here, municipal liability is premised upon a decision of an individual, "it must first be alleged adequately that a defendant is a final policymaker.  Only then can a court proceed to the question of whether the single act or decision of that defendant constituted municipal policy." <u>Baxter by Baxter v. Vigo County School Corp.</u>, 26 F.3d 728, 735 (7th Cir. 1994); <u>see</u> " <u>Blue v. D.C.</u>, 811 F.3d 14, 20 (D.C. Cir. 2015) ("Section 1983 plaintiffs have several ways to allege a municipal policy, each with its own elements. If the plaintiff fails to identify the type of municipal policy at issue, the court [is] unable to determine, as required by <u>Iqbal</u>'s second step, whether the

plaintiff had provided plausible support for her claim."). Thus, "to survive a motion to dismiss" Plaintiffs must plead "facts which establish that the challenged policy was promulgated or ratified by the city's policymaker." Groden v. City of Dallas, 826 F.3d 280 (5th Cir. 2016); accord Parkell v. Danberg, 833 F.3d 313, 331 (3d Cir. 2016); compare Santiago v. Warminster Township, 629 F.3d 121, 125 (3d Cir. 2010) (stating that, to avoid dismissal, plaintiff had "to plead in some fashion that [official] had final policy making authority, as that is a key element of a Monell claim") with Paige v. Coyner, 614 F.3d 273, 284 (6th Cir. 2010) (finding that allegation that public official had "final policy making authority" for county board of commissioners sufficient to state claim for municipal liability under § 1983).

Because Plaintiffs do not allege that Carr had final decision making authority, Metro is entitled to dismissal. Said dismissal, however, will be without prejudice to Plaintiffs' amending their claim to adequately plead municipal liability based upon Carr being a policymaker if they can do so in good faith.

## IV. Conclusion

On the basis of the foregoing, Carr's Motion to Dismiss will be granted with respect to the ETREPA claim, but denied with respect to Plaintiffs' First Amendment claim. Metro's Motion to Dismiss will be granted.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE